WALTER J. LASTOWSKI, an Infant, by WALTER V. LASTOWSKI, His Father and Natural Guardian, et al., Appellants, *v.* NORGE COIN-O-MATIC, INC. et al., Respondents.

Second Department, April 8, 1974.

*Finkelstein, Mauriello, Kaplan & Levine, P. C. (Howard Karger* of counsel), for appellants.

*Alfred Schleider (Herbert L. Ruttenberg* of counsel), for respondents.

SHAPIRO, J. The issue in this case was spawned by *Dole* v. *Dow Chem. Co.* (30 N Y 2d 143) and *Gelbman* v. *Gelbman* (23 N Y 2d 434). Basically the question is: Does lack of supervision of an unemancipated child by his parents, as a result of which he is injured, constitute an actionable tort? We answer that question in the negative.

THE PLEADINGS AND THE DECISION AT THE TRIAL TERM.

The infant's father brought this action to recover for the injuries suffered by his infant son, aged four years,[1] when he was struck by a motor vehicle driven by defendant Price and owned by defendant Norge Coin-O-Matic, Inc. (Norge). The father also seeks recovery for his own medical expenses and

---

1. Although the complaint and answer do not state the age of the infant plaintiff, both the plaintiffs' and the defendants' briefs assert that he was four years old at the time of the accident.

the loss of the services and companionship of his infant son. The accident happened on a public highway.

The defendants, in their amended answer, asserted a counterclaim which alleges that the infant's damages were due to the negligence of the father in *failing to supervise the infant* in an area traversed by motor vehicles, and they therefore ask for an apportionment of the liability between themselves and the father if they are held liable on the infant's cause of action. The plaintiffs orally moved to dismiss the counterclaim, but the Trial Term ruled that it stated a valid cause of action. The plaintiffs appeal, contending that the counterclaim is insufficient as a matter of law, because it fails to state that the infant "was in need of unusual supervision or that he was in some way mentally or physically disabled."

We agree with the plaintiffs' contention that the counterclaim is insufficient as a matter of law, but not upon the ground urged by them. In accord with the only three appellate court decisions on that subject which we have been able to find in the State (*Holodook* v. *Spencer,* 43 A D 2d 129 [3d Dept.]; *Graney* v. *Graney,* 43 A D 2d 207 [3d Dept.]; *Ryan* v. *Fahey,* 43 A D 2d 429 [4th Dept.]) we hold that in this State and under the circumstances of this case there is no tort liability on the part of a parent for negligent failure to properly supervise an unemancipated child.

#### THE LAW

The counterclaim in this case is based on the decision in *Dole* (30 N Y 2d 143, 148–149, *supra*), in which the Court of Appeals made new law when it decided that "where a third party is found to have been responsible for a part, but not all, of the negligence for which a defendant is cast in damages, the responsibility for that part is recoverable by the prime defendant against the third party" and that "to reach that end there must necessarily be an apportionment of responsibility in negligence between those parties".

To get under the umbrella of that case the defendants, in their counterclaim, allege that the plaintiff father was guilty of negligence, because he failed to properly supervise his infant son at the place where the latter was injured. My learned brother Justice HOPKINS and I agree that if the counterclaim states a cause of action it is only because there is a recognizable tort of failure to supervise, which, under the facts here, could give rise to an action directly by the infant against his parents for the injuries he sustained in the instant accident. Justice HOPKINS, in his erudite dissent, concludes that there

is such a tort and that the removal of the bar against intrafamilial suits by *Gelbman* v. *Gelbman* (23 N Y 2d 434, *supra*) sanctions the counterclaim here interposed. I do not agree.

Absent binding precedents in this State establishing the existence of a cause of action in tort for injuries sustained by an unemancipated child arising from inadequate parental supervision (and I have found none), we are faced with the need to determine whether as a matter of public policy we should now judicially create such a cause of action.

That parents owe a moral duty to their children which flows from what Judge LEWIS in *Cannon* v. *Cannon* (287 N. Y. 425, 427–428) described as "that natural kinship between parent and child" is beyond question. Discussing that duty, Judge LEWIS said (pp. 428–429):

"The law requires of parents that they provide care, maintenance and guidance for their unemancipated minor child. To that end they are entitled to his custody. Such duties and rights may be enforced by legal process. Thus has the law recognized in the family something more than a social unit, something more practical than a spiritual concept. It has sanctioned the family relationship — particularly the relationship of parent and child — as the basis for regulating those reciprocal obligations between parent and child which may be the subject of legal enforcement.

"In the process of rearing a child and the fulfillment of the legal duties of care, maintenance and guidance, the conduct of the parents toward the child is of necessity affected by the parental relation. We know that family unity is not created by law. But, as we have seen, the law does not fail to recognize family unity as a factor in human conduct and relationship. As to the child — what he may expect from his parents and what he owes to them as a matter of filial duty differ widely from his rights and duties in his relations to those not in *loco parentis*. As to the parents — the law which imposes upon them the duty to support and discipline a minor child, and to prescribe a course of conduct designed to promote his health, education and recreation, accords to the parents a wide discretion. In the exercise of that discretion and the performance of duties imposed by law through no choice by the parents, they are held to no higher standard of care than the measure of their own physical, mental and financial abilities to provide for the well-being of their child. Lack of means, physical weakness or mental incapacity may cause parents to tolerate conditions in the family home which are unsafe and which might afford a basis for liability to one coming to the premises as an

invitee or licensee. Not yet, however, have our courts granted an unemancipated child — whom the law decrees to be a member of that household — the right to hold this parents in damages for unintended personal injuries resulting from such conditions. *Indeed, if within the wide scope of daily experiences common to the upbringing of a child a parent may be subjected to a suit for damages for each failure to exercise care commensurate with the risk — for each injury caused by inattention, unwise choice or even selfishness — a new and heavy burden will be added to parenthood* " (emphasis supplied).

In *Badigian* v. *Badigian* (9 N Y 2d 472) a mother brought an action against her husband on behalf of their three-year-old child. She alleged that her husband had negligently left the family automobile unlocked in a parking lot and that the child released the brakes and was hurt when he tried to jump from the vehicle. In writing for the court (Judge FULD [later Chief Judge], dissenting), Chief Judge DESMOND said (p. 473) : " There is no decision in any American or English appellate court sustaining such a cause of action as is here alleged ". In his dissent, Judge FULD pointed out (p. 474) : " If the present decision were necessary to preserve the integrity of the family, I would subscribe to it. But I do not believe that it is ". He then said (pp. 474-475) that " to deny redress in automobile negligence cases, is wrong in principle and at odds with justice and modern-day realities " and that (p. 478) " we should hold that the child is not to be denied the benefit of insurance that would be available for a stranger ". He then reasoned (p. 479) : " Certainly, where there is insurance, it becomes more difficult to justify the stock arguments advanced against recovery, to say that recognition of a right of action destroys our concept of the family unit. Gone is the fear of impoverishing the family, of impairing parental discipline or of disrupting domestic harmony. The child's suit, if successful, will provide a fund to care for its injuries which might otherwise be unavailable. Far from upsetting family ties, the suit is actually an incident in the course of a family's provident management of its affairs. (See, e.g., *Dunlap* v. *Dunlap,* 84 N. H. 352, 368, *supra.*) "

The rationale of his dissent was that the plaintiff's cause of action would not tend to destroy the " integrity of the family ". Tested by that yardstick we are compelled to conclude that permitting *automatic* lawsuits or, as in this case, an *automatic* counterclaim on the basis of an allegation of failure to supervise would have the very effect (the disruption of the family unit) which Judge FULD said would motivate him to agree with the majority in *Badigian* (*supra*). In *Gelbman* v.

*Gelbman* (23 N Y 2d 434, 437–438, *supra*),[2] the court (per BURKE, J.) adopted " the convincing arguments advanced by Judge FULD in his comprehensive dissent in *Badigian* ", but was careful to point out that " the present litigation is, in reality, between the parent passenger and her insurance carrier " and that " *viewing the case in this light,* we are unable to comprehend how the family harmony will be enhanced by prohibiting this suit " (last emphasis supplied). Judge BURKE meticulously emphasized (p. 439) the court's unanimous conclusion that " *by abolishing the defense of intrafamilial tort immunity for nonwillful torts, we are not creating liability where none previously existed. Rather, we are permitting recovery, previously denied, after the liability has been established* " (emphasis supplied).

Thus *Gelbman*, in erasing the ban against intrafamily suits, did not create a cause of action based upon lack of parental supervision. That as a matter of public policy we should not now strain to create such a cause of action is more than made evident by the ingenuity which has been exhibited in the multifarious kinds of counterclaims which have been interposed in the cascade of recently reported cases. Their nature and extent[3]

2. *Gelbman* was a suit by a parent against her 16-year-old son for injuries she suffered when an automobile driven by him in which she was a passenger collided with another vehicle. Thus, if it were not for the intrafamilial immunity doctrine, she would clearly have had a cause of action against the driver and owner of the car in which she was riding if the accident was in any respect due to her son's negligence, just as she would have had a cause of action against the driver of the other car if there had been negligence by him. If the accident had occurred after *Dole*, the driver of the other car, if sued by Mrs. Gelbman, would have had a third-party claim against the son. But we do not here deal with situations like *Gelbman* which involve conduct by a defendant who is a member of the same family as the injured plaintiff, which conduct, if performed against a person outside the family, would have subjected the actor to a suit for tort. Rather, we deal here solely with whether a claim for injuries resulting from a parent's negligent supervision or control of his children states a cause of action.

3. The following cases involved the question before us: *Holodook* v. *Spencer* (43 A D 2d 129); *Searles* v. *Dardani* (75 Misc 2d 279); *Marrero* v. *Just Cab Corp.* (71 Misc 2d 474); *Collazo* v. *Manhattan & Bronx Surface Tr. Operating Auth.* (72 Misc 2d 946); *Fake* v. *Terminal Hardware* (73 Misc 2d 39); *Hairston* v. *Broadwater* (73 Misc 2d 523); and *Miller* v. *Cross* (75 Misc 2d 940), all of which involved child pedestrians injured while on the street or public highway; *Kiernan* v. *Jones* (73 Misc 2d 829); and *Sorrentino* v. *United States* (344 F. Supp. 1308), which involved children injured while allowed by their parents to ride bicycles on the public highway; *Salley* v. *Weiss* (74 Misc 2d 619); and *Morales* v. *Moss* (44 A D 2d 687 [decided herewith]), both of which involved infant plaintiffs injured by ingestion of poisonous paint chips and flakes in their parents' apartments; *Ryan* v. *Fahey* (43 A D 2d 429); and *Northrop* v. *Hogestyn* (75 Misc 2d 486), each of which involved a cross

make it manifest why the counterclaim interposed in this case should not be sustained. Other examples of causes of action which could be asserted if lack of parental supervision is deemed to be a valid cause of action readily come to mind. A mother is bathing two-year-old Jane in the bathtub. Jimmy, age three, is cavorting around in the kitchen. He comes upon a box of matches which the mother absentmindedly has left within his reach. He starts a fire in which he is badly burned and the home and its contents are destroyed. If *Gelbman (supra)* has opened the door to a lawsuit against a parent to recover damages for lack of parental supervision, the mother would face the following lawsuits: (a) by Jimmy to recover for his injuries, (b) by the father to recover his medical expenses, etc., in caring for Jimmy and for the damages occasioned to his property and (c) by the landlord for the damages to his real estate.

Another commonplace occurrence is one in which a child climbs on a chair, opens a medicine chest and ingests iodine or some other poisonous substance.[4] Is the mother to be cast in damages

---

claim by a defendant against the injured infant's parent based on allegations that negligent parental supervision contributed to the infant's injuries. The cases of *Bilgore* v. *Rennie* (72 Misc 2d 639), involving a child injured while riding an allegedly defective bicycle suing the seller of the bicycle; *Meade* v. *Roberts* (71 Misc 2d 120), involving a child injured in a two-car collision while a passenger in a car driven by its parent; and *Orphan* v. *Relyea* (73 Misc 2d 1098), involving a child injured in an explosion resulting when his father lit the heater in the family sauna, are all cases where any parental liability that may exist would flow from an affirmative negligent act of the parent which would subject him to liability to anyone injured thereby, not from any failure to carry out his parental duty of supervision and control of his child.

4. That cases of child poisoning resulting from parental lack of supervision do not present isolated occurrences is made more than manifest by the figures we have obtained from the Department of Health of the City of New York. They show the following:

Cases of poisoning reported in 1971 by age and poisoning agent

| Age (in Yrs.) | Total | External medicine | Internal medicine | Paints solvents | Household preparations | Petroleum distillates | Cosmetics | Pesticides | Gases, vapors | Plants | Miscellaneous |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Under 1 Year | 1,498 | 191 | 168 | 133 | 264 | 21 | 70 | 132 | 1 | 222 | 296 |
| 1 | 6,074 | 593 | 940 | 580 | 1,490 | 172 | 602 | 502 | 3 | 530 | 662 |
| 2 | 7,007 | 605 | 2,395 | 381 | 1,189 | 188 | 774 | 358 | 5 | 543 | 569 |
| 3 | 3,075 | 202 | 1,455 | 99 | 366 | 58 | 184 | 144 | 4 | 311 | 252 |
| 4 | 1,246 | 83 | 513 | 63 | 151 | 27 | 58 | 60 | 0 | 148 | 143 |
| 5-9 | 1,450 | 94 | 442 | 83 | 180 | 26 | 51 | 79 | 2 | 217 | 276 |
| 10-14 | 868 | 58 | 363 | 88 | 84 | 32 | 16 | 29 | 3 | 86 | 109 |
| 15-19 | 1,799 | 81 | 1,268 | 47 | 126 | 41 | 21 | 47 | 9 | 76 | 83 |
| 19 and over | 6,332 | 409 | 3,651 | 172 | 798 | 120 | 94 | 278 | 105 | 373 | 332 |
| Child, unspecified age | 91 | 7 | 15 | 5 | 16 | 0 | 3 | 3 | 1 | 27 | 14 |

in a suit by the child grounded on the theory of lack of super-vision? And if the parents are engaged in matrimonial litigation is the mother — at the behest of the father in a suit brought on behalf of the infant — to be compelled to engage counsel and defend herself in a negligence action the basis of which is mere failure to supervise? Of. if a child of tender years is permitted, unattended, to ride a bicycle on the sidewalk and falls off and injures himself, is his mother to be subject to a lawsuit by him and his father? Other examples, too numerous to mention, and not beyond the ingenuity of counsel to maintain, could readily be cited.

To permit the institution of such lawsuits, thereby subjecting a parent or parents to the burden of engaging and paying counsel, with a resulting possible liability, on a mere allegation that they failed sufficiently to supervise their child against injury would only encourage second-guessing the propriety of the every-day actions of a parent.

Recognition of such a cause of action, on the basis of *Gelbman* and *Dole* (*supra*), would adversely affect family unity by creating a *direct* conflict of interest between the injured child plaintiff and his parents in any action for negligence they might institute on his behalf. In prosecuting such a lawsuit they would subject themselves to the possibility of having to defend a counterclaim (with its resultant legal costs) and in addition they would face the possibility of having to pay part of the recovery obtained by the child. As Professor David D. Siegel, in his Practice Commentaries on CPLR 3019 (McKinney's Cons. Laws. of N. Y., Book 7B, CPLR [C3019:42, p. 246]) succinctly pointed out: " The result, if such a claim were sustained, is that the parents would have to pay out of their own pockets whatever portion of the liability was found to be theirs. The infant's claim would technically be undiminished. He would

Cases of poisoning reported in 1972 by age and poisoning agent

| Age (in Yrs.) | Total | External medicine | Internal medicine | Paints, solvents | Household preparations | Petroleum distillates | Cosmetics | Pesticides | Gases, vapors | Plants | Miscellaneous |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Under 1 Year | 1,743 | 250 | 167 | 153 | 265 | 19 | 108 | 158 | 8 | 280 | 335 |
| 1 | 7,982 | 779 | 1,213 | 714 | 2,057 | 225 | 847 | 626 | 7 | 681 | 833 |
| 2 | 9,485 | 776 | 3,179 | 547 | 1,690 | 217 | 1,104 | 538 | 6 | 688 | 740 |
| 3 | 3,948 | 287 | 1,820 | 173 | 517 | 64 | 259 | 173 | 3 | 330 | 322 |
| 4 | 1,476 | 87 | 642 | 83 | 198 | 20 | 67 | 68 | 3 | 140 | 168 |
| 5–9 | 1,831 | 130 | 564 | 80 | 235 | 32 | 57 | 97 | 10 | 294 | 332 |
| 10–14 | 1,032 | 67 | 364 | 104 | 118 | 31 | 22 | 39 | 5 | 109 | 173 |
| 15–19 | 1,805 | 72 | 1,178 | 83 | 161 | 51 | 35 | 42 | 11 | 82 | 90 |
| 19 and over | 7,217 | 499 | 4,048 | 194 | 1,016 | 136 | 100 | 304 | 144 | 378 | 398 |
| Child, unspecified age | 122 | 11 | 17 | 13 | 27 | 1 | 12 | 6 | 0 | 24 | 11 |

get his full recovery against the named defendant, who would then get pro rata recovery against the parents for their *Dole* share. As a practical matter, however, this could have repercussions detrimental to the infant, diminishing the force with which his action, controlled or in any event substantially influenced by his parents, is prosecuted. Significantly, it could create internal family trouble, quite at odds with anything *Gelbman* intended. Suppose, for example, that the *Dole* judgment bankrupts the parents. If it threatens them with insolvency, they may go to desperate lengths to get their hands on their own child's money, which is ordinarily beyond their legal reach. See CPLR 1206, 1210. Surely neither *Gelbman* nor *Dole* intended that.''

Justice HOPKINS, in his dissent states: '' Transposed to the parent-child relationship in the family, the rule of liability logically should therefore be whether the parent acted as a reasonable parent would have acted under the circumstances. This was the rule adopted in California (*Gibson* v. *Gibson*, 3 Cal. 3d 914, *supra*), which, in my opinion, best fits the factual and legal patterns implicit in the family structure.'' (P. 142)

I can think of no better answer to that contention than to quote from Judge FULD's dissent in *Badigian* v. *Badigian* (9 N Y 2d 472, 481, *supra*), the sense of which was adopted by the court in *Gelbman* (*supra*). He had this to say on that subject (pp. 480–481) : '' There may be injustice, as well as difficulty, in applying the standardized duty of the reasonable man in such a situation. Heed, it may well be, must be given to excuses to which the law declines to listen when the victim is a business visitor. The house or the apartment may be out of order or in need of repair, but, there is force to the query, what is the father to do if there is no money to repair it? It may be unsanitary and in poor condition, but it is futile to seek a better one when it is beyond the father's financial ability to pay the higher rent. Those who share the family life must of necessity share its fortunes, its privations and hardships, as well as its gains. * * * In the ordering of the home, the father is still the judge, or, better perhaps, the king, not liable for error while he acts in good faith, without malice or indifference.''

Justice GREENBLOTT, speaking for the majority in *Holodook* v. *Spencer* (43 A D 2d 129, 135, *supra*), pointed to still other variables which make it improper to submit to a jury the reasonableness of the action of a parent on a charge of lack of supervision when he said: '' Each child is different as is each parent; as to the former, some are to be pampered while some

thrive on independence; as to the latter, some trust in their children to use care, others are very cautious. Considering the different economic, educational, cultural, ethnic and religious backgrounds which must prevail, there are so many combinations and permutations of parent-child relationships that may result that the search for a standard would necessarily be in vain — and properly so  *  *  *  Surely there can be no place in such a natural scheme for second-guessing by a jury whose members' views on the subject will be unavoidably influenced by their own unique and inimitable experiences, both as children and parents.''

In *Ryan* v. *Fahey* (43 A D 2d 429, 430, *supra*) Mr. Justice MOULE, writing for a unanimous court, posed the question before the court and gave its answer in the following manner: '' The question we are here called upon to decide is whether a *non sui juris* child, injured while at play, can bring a lawsuit against his mother for failing to properly supervise his activities. In so doing, we must determine whether such an action was within the contemplation of the Court of Appeals in *Gelbman* v. *Gelbman* (23 N Y 2d 434) when it abolished the defense of intrafamilial immunity from suit on nonwillful torts. In our view, it was not.''

In that case the factual picture, as set forth in the opinion, was as follows (pp. 430–431): '' We have before us a situation in which the plaintiff, a three-year-old boy, was playing in the backyard of a neighbor's home when the neighbor's eight-year-old son ran over his hand with a power-driven riding lawn mower. The infant plaintiff's mother and the neighbor were in the neighbor's house at the time and, as a result of the accident, plaintiff, with his father serving as guardian ad litem, commenced an action in negligence against his mother, the neighbor and her son. In the complaint, $500,000 damages was demanded for the infant and $10,000 in derivative damages was demanded for the father. It was alleged that the mother's acts of negligence consisted of her failure to properly supervise the infant plaintiff while at play, and that the neighbor's acts consisted of failing to properly supervise and control her son in his operation of the power lawn mower. The neighbor cross-claimed against the mother for an apportionment of damages under *Dole* v. *Dow Chem. Co.* (30 N Y 2d 143) and the mother then moved at Special Term to dismiss her son's and husband's complaint on the ground that it failed to state a cause of action. This appeal results from Special Term's denial of that motion and, thus, opens for scrutiny the whole issue of just how far the

law should go in permitting suits by children against their parents."

In giving the reasons for his conclusion, Justice Moule said (p. 433): "We do not believe that *Gelbman* holds that within the family relationship the failure of a parent to properly discipline his child, to instruct him as to the pitfalls of the world around him, to provide for his general comfort and well-being, or to diligently supervise his activities so as to protect him from accidental injury should be the basis for an actionable form of misconduct in the State of New York. We know of no Court of Appeals or Appellate Division case, nor any statute, expressly authorizing or allowing a suit by a child against his parent for such failings.

"In brief, and with the narrow question presented by the case before us specifically in mind, we hold that negligent supervision is not a tort. It was not a tort prior to the *Gelbman* case and by *Gelbman's* own terms, its holding was not meant to create liability where none previously existed."

We think that *Holodook* and *Ryan* (*supra*) completely and conclusively demolish any contention that *Gelbman* (*supra*), as amplified by *Dole* (*supra*), sanctions the lack of parental supervision counterclaim here interposed, but I think that one further word is appropriate. Justice Hopkins contends that the standard of negligence he proposes "promotes flexibility and is not fettered by built-in conditions which alike may be difficult of application and inappropriate under certain circumstances." But the fact is that his proposed standard, the "fictional" reasonable parent, is so "flexible" as to constitute no standard at all, depending as it would have to on innumerable variables such as the number and ages of the children and the differing economic, educational, cultural, ethnic, religious, physical, social and health background of the particular family involved.[5]

#### CONCLUSION.

To uphold the creation of a cause of action based upon parental lack of supervision, by reliance upon the courageous and progressive changes in the law brought about by *Gelbman* and *Dole* (*supra*), would involve an egregious perversion of their purpose. It would draw the parent-child relationship, based

---

5. On this phase of the case Presiding Justice Gulotta apparently disagrees with Justice Hopkins, for he says: "With the policy reasons for not applying the standardized duty of the reasonable prudent man to household situations involving a parent-child relationship alluded to by Judge Fuld in *Badigian* (*supra*) and Justice Shapiro in this case, I find myself in agreement."

so essentially on mutual love and concern and trust, into the reefs, shallows, tides and whirlpools of litigation in a manner which could only result in an *in terrorem* effect on even the most conscientious parent. We cannot believe that the court which framed *Gelbman* and *Dole* (*supra*) would permit their use to sow such dragon's teeth.

The order appealed from should be reversed, on the law, with $20 costs and disbursements, and the plaintiffs' motion to dismiss the defendants' counterclaim against the plaintiff parent should be granted.

HOPKINS, J. (dissenting). The question on this appeal results from the consequences of two recent decisions of the Court of Appeals in *Gelbman v. Gelbman* (23 N Y 2d 434) and *Dole v. Dow Chem. Co.* (30 N Y 2d 143): may a tort-feasor sued by an infant and his parent interpose a counterclaim against the parent on the ground that the parent's lack of proper supervision was a concurrent cause of the infant's injuries? The dimensions of the question have been clearly defined in the perceptive opinions of Justice GREENBLOTT, speaking for the majority, and of Justice STALEY, dissenting, in *Holodook v. Spencer* (43 A D 2d 129) and *Graney v. Graney* (43 A D 2d 207). (See, also, *Ryan v. Fahey,* 43 A D 2d 429.)

Since a question of pleading alone is before us, the allegations must be taken as true and enveloped with the benefit of every reasonable inference in their favor (*Cohn v. Lionel Corp.,* 21 N Y 2d 559, 562). The plaintiffs on this appeal do not adopt the theory of an absolute denial of all liability of a parent to his child for failure to supervise, which the majority in *Holodook* and *Graney* (*supra*) espoused; instead, it is the plaintiffs' position that the counterclaim is deficient because it does not state that the plaintiff infant "was in need of unusual supervision or that he was in some way mentally or physically disabled." Though the complaint and answer do not allege the age of the infant, both the plaintiffs' and the defendants' briefs assert that he was four years old at the time of the accident. In view of the age of the infant, the pleading should not be dismissed, even on the limited ground urged. Surely, a child of four, on the borderline of *non sui juris* (cf. *Schaffner v. Rockmacher,* 38 A D 2d 835; *Dugan v. Dieber,* 32 A D 2d 815), requires unusual supervision as a necessary implication of his condition and age. The order could therefore be affirmed for this reason alone.

But I prefer to meet the issue squarely, as the court acted in *Holodook* and *Graney* (*supra*). There are, I think, several

choices of rules open to the court. We might reject the notion of liability based on lack of proper supervision, as did the majority in *Holodook* and *Graney* (*supra*). We might accept the notion of liability arising from inadequate supervision, but only if that liability flowed from designated areas of the relationship between parent and child, such as stated in the rule constructed by the Wisconsin Supreme Court and followed by other courts (e.g., *Goller* v. *White*, 20 Wis. 2d 402; *Plumley* v. *Klein*, 388 Mich. 1; *Silesky* v. *Kelman*, 281 Minn. 431; *Streenz* v. *Streenz*, 106 Ariz. 86). We might accept broadly the notion of liability for failure of supervision, but impose a standard measured by the care exercisable by a reasonable parent under the circumstances existing in the particular case — a rule formulated by the California Supreme Court (e.g., *Gibson* v. *Gibson*, 3 Cal. 3d 914). Each of these notions has varying advantages and disadvantages, and each must be examined separately.[1]

I

#### SHOULD LACK OF PARENTAL SUPERVISION BE A TORT?

*Gelbman* v. *Gelbman* (23 N Y 2d 434, *supra*) neither precluded the lack of parental supervision as a ground for liability nor approved it. It merely abolished the defense of parental immunity and permitted " recovery, previously denied, after the liability has been established " (*id.*, p. 439). It refers specifically to recovery for " nonwillful negligent acts " (*id.*, p. 438). The action itself was not to recover damages on behalf of a child against his parent; it was the reverse — the parent sued the child to recover damages for the child's negligence in operating an automobile. Nevertheless, the stress of *Gelbman* imposes liability for negligence in any intrafamily accident.

The issue of the negligence of a parent in attending to the care of a child, doubtless on account of the intervention of the intrafamily immunity, usually was intertwined with the issue of the child's own negligence (cf. *Kupchinsky* v. *Vacuum Oil Co.*, 263 N. Y. 128; *Regan* v. *International Ry. Co.*, 205 App. Div. 425; *Ryczko* v. *Klenotich*, 204 App. Div. 693), sometimes on the theory of imputed negligence — a defense to an action on behalf of the child not sustainable in most jurisdictions (Ann. 51

---

1. There is a fourth choice which we consider impermissible — that we return to the notion of parental immunity for all tortious conduct toward a child. Some courts have clung to this rule in the face of the trend to abolish the immunity (e.g., *Chase* v. *Greyhound Lines*, 195 S. E. 2d 810 [W. Va.]; *Bahr* v. *Bahr*, 478 S. W. 2d 400 [Mo.]). We consider this approach to be irrelevant in New York after *Gelbman* v. *Gelbman* (23 N Y 2d 434, *supra*).

A. L. R. 209; cf. General Obligations Law, § 3–111). Nonetheless, that the negligence of the parent in caring for the child was a recognized breach of duty owing to the child was not seriously disputed (see, e.g., *Longacre* v. *Yonkers R. R. Co.*, 236 N. Y. 119). It was customarily treated as a matter of fact for the jury.[2]

Thus, the reach of the duty of supervision was embodied in the following language of the Court of Appeals in a case decided in 1868 (*Mangam* v. *Brooklyn R. R. Co.*, 38 N. Y. 455, 457): "Legal negligence is the omission of such care as persons of ordinary prudence exercise and deem adequate to the circumstances of the case. This definition, applied to the point in consideration, will exonerate the parents from the charge of negligence, if they used that degree of care. This conclusion is also supported by the reasoning in *Hartfield* v. *Roper* [21 Wend. 615]. It is there said, that the law has placed infants in the hands of vigilant and generally affectionate keepers, their own parents, and if there be any legal responsibility for damages, it lies on them. Surely, an infant could not recover against his parent or guardian, for negligence in permitting him to escape into the street, unless he could show some omission of ordinary care to prevent it. The inquiry on this point, then, is, whether the parents of the plaintiff were guilty of negligence, in permitting him to get into the street; for, if not, the nonsuit cannot be sustained upon that ground."

Because of the immunity created by the court, the liability could not be enforced by the infant against the parent. However, it seems clear that the duty of supervision existed in our early law. The imputation of the parent's negligence to the child to defeat a recovery for the child's injuries was increasingly subjected to criticism, for the reason that the rule visited the punishment on the child for the sins of the parent; and the rule was finally extinguished by the statute (General Obligations Law, § 3–111).[3]

Following *Gelbman* (*supra*), several decisions have recognized negligent supervision by a parent as a ground for

2. Thus, in *Longacre* v. *Yonkers R. R. Co.* (236 N. Y. 119, 123) the court said, "We are, therefore, all agreed that it cannot be said as matter of law that the parents were guilty of negligence in intrusting their children with the girl or that she was guilty of negligence in not trying to control them and keep them off the platform." (See, also, *Fallon* v. *Central Park, North and East Riv. R. R. Co.*, 64 N. Y. 13; *Cosgrove* v. *Ogden*, 49 N. Y. 255; *Kunz* v. *City of Troy*, 104 N. Y. 344.)

3. A survey of the New York decisions in Ann. 51 A. L. R. 209, 223–224, indicates that only a small percentage of the jury verdicts found that the parent was guilty of a breach of the duty of supervision as a matter of fact. For a survey of cases outside New York, see *Shirack* v. *Gage* (166 Kan. 719).

liability (e.g., *Sorrentino* v. *United States,* 344 F. Supp. 1308; *Hairston* v. *Broadwater,* 73 Misc 2d 523; *Meade* v. *Roberts,* 71 Misc 2d 120). In States in which the defense of parental immunity has been abrogated, the infant's right to recover for failure of supervision has similarly been acknowledged (e.g., *Cole* v. *Sears, Roebuck & Co.,* 47 Wis. 2d 629; *Thoreson* v. *Milwaukee & Suburban Transp. Corp.,* 56 Wis. 2d 231; *Thomas* v. *Kells,* 53 Wis. 2d 141; cf. *Petersen* v. *City and County of Honolulu,* 51 Hawaii 484; *Gibson* v. *Gibson,* 3 Cal. 3d 914, *supra*).

Since *Gelbman* (*supra*) terminated the intrafamilial immunity, the duty of supervision still continues unconfined by that defense, unless we are to say that public policy forbids now the enforcement of the duty. Sound judicial process commands us to consider whether the disadvantages of enforcement outweigh the advantages (cf. *Tobin* v. *Grossman,* 24 N Y 2d 609, 615-619).

It is probable that no child will sue his parent for any unintentional tort, unless insurance is present protecting the parent. This is the ordinary result of the close relationship between the parties; the natural affection would first preclude a suit and, of course, one cannot overlook the practicality that the parent, as the person who usually institutes the suit, would hardly make himself an adversary liable to payment of damages. Neither of these factors is a valid ground for refusing recovery to a child who has suffered injury as the result of the lack of supervision of the parent. The other reasons customarily offered to prevent liability — the loss to the family exchequer, the destruction of family harmony, the danger of collusion — are beyond debate now, as all of them were considered unavailing as grounds for the intrafamilial immunity in *Gelbman* (*supra*).

*Dole* v. *Dow Chem. Co.* (30 N Y 2d 143, *supra*) provides a reason against an immunity remaining on behalf of the parent when sued by a defendant said to have been negligent in causing an injury to the child. That reason is that it is not just to burden the defendant, even though negligent, with all the burden of the damages, if the parent's negligence contributed to the injury. The child is not punished for the parent's sins by the adoption of this rule, for the child will receive the benefit of the whole recovery. If the parent is punished by the apportionment of the recovery, it is because of his own conduct and the inequity of allowing him to escape scot-free at the expense of the joint tort-feasor.

Accordingly, I think, as did Justice STALEY in his dissent in *Graney* v. *Graney* (43 A D 2d 207, *supra*), that the immunity

of a parent from suit based on his negligence toward his child has been totally removed by *Gelbman* (*supra*). Once the parent's duty to care for and supervise the child is established as part of the parent's general responsibility, then it must follow that the negligent discharge of that duty — as it follows in the instance of any other legal duty — results in liability for the damages ensuing.

## II

### SHOULD THE RULE OF LIABILITY BE LIMITED TO CERTAIN AREAS OF SUPERVISION?

Wisconsin, in abolishing the doctrine of parental immunity, did not extend liability to the entire sphere of the family relationship. It carved out two areas of exceptions to liability: (1) where the negligent act involved an exercise of reasonable parental authority over the child and (2) where the negligent act involved an exercise of reasonable parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care (*Goller* v. *White*, 20 Wis. 2d 402, 413, *supra*). It is unquestionably desirable and, indeed, a goal of the common law, that a rule imposing liability be as certain and definite as possible. The presence of exceptions, particularly those phrased in vague and abstract terms, breeds uncertainty in a rule.

The experience in Wisconsin bears out this prophecy. In *Lemmen* v. *Servais* (39 Wis. 2d 75) a six-year-old *child* was struck by an automobile while crossing the street after alighting from a school bus. The defendant driver served a third-party complaint against the parents, claiming that they had failed to instruct the child properly concerning safety procedures. The court held that the failure fell within the exception of the exercise of ordinary parental discretion with respect to " other care " (p. 78) of the child. But in *Cole* v. *Sears, Roebuck & Co.* (47 Wis. 2d 629, *supra*) a two-year-old child was injured while playing on a swing, and the court held that the failure to provide proper supervision by the parent did not come within the exceptions. And in *Thoreson* v. *Milwaukee & Suburban Transp. Corp.* (56 Wis. 2d 231, *supra*), where a three-year-old child ran out in front of a bus and was hit, causing a substantial injury, the mother of the child was held to be liable for 40% of the damages as a result of her liability arising from failure to exercise proper supervision over the child. The court found that the exceptions did not embrace the ordinary parental acts of upbringing.

The difficulties inherent in the application of the exceptions under the Wisconsin rule are illustrated in *Thomas* v. *Kells* (53 Wis. 2d 141, *supra*). A child lived with his family in the first floor apartment of a duplex. A stairway ran in the rear of the building between the basement and the attic and was used in common by both the first and second floor tenants. The child fell on the stairway and an action was brought in his behalf in which it was alleged that the landlord had permitted the stairway to become defective. The landlord served a third-party complaint on the parents, claiming that they had contributed to the accident because they had failed to care properly for the child. The trial court sustained a demurrer to the landlord's pleading, finding that the accident occurred in the home and therefore the exceptions applied. The Wisconsin Supreme Court reversed, holding that a trial would be necessary to prove whether the conditions of the home and the building justified the invocation of the exceptions.[4] The court decided that one of the issues was whether the stairway could fairly be said to be within the provision of housing vested in the parents' discretion.

It is far more desirable that a simpler and more understandable rule be fashioned. In New York, as *Gelbman* v. *Gelbman* (23 N Y 2d 434, 437–438, *supra*) teaches, the former rule of immunity has been breached by various exceptions leading to anomalies. A rule should not be installed in place of another which will achieve unsatisfactory results — the very reason for which the change in rule was made.

## III

### SHOULD THE RULE BE BASED ON THE STANDARD OF A REASONABLE PARENT?

The standard by which negligent behavior has been traditionally measured is that of the reasonable person acting under the circumstances of the case. Transposed to the parent-child relationship in the family, the rule of liability logically should therefore be whether the parent acted as a reasonable parent would have acted under the circumstances. This was the rule adopted in California (*Gibson* v. *Gibson*, 3 Cal. 3d 914, *supra*), which, in my opinion, best fits the factual and legal patterns implicit in the family structure.

---

4. Some of the questions raised by the court to be determined at the trial were: (1) Did alternative methods of ingress and egress to the family apartment exist? (2) Could the stairway be considered part of the home? (3) Was using a defective stairway a proper exercise of parental discretion in providing housing?

For one thing, it takes into account, without special reference the issue raised by the plaintiffs on this appeal, i.e., that it must be shown that the infant was in need of unusual supervision or was in some way handicapped. It also includes, without any required mention, the issue of age span during which a reasonable and prudent parent might be expected to exercise supervision and control. These issues would be left to the trier of the facts under a rule which would allow complete consideration of the role of the parent under the facts of the case.

Moreover, the rule extends broad scope to the trier of the facts to enforce community standards and current family practices in the case at hand. The rule, in short, promotes flexibility and is not fettered by built-in conditions which alike may be difficult of application and inappropriate under certain circumstances.

The rule, too, accommodates the reluctance to overtax the parent with a duty that cannot easily be met, to which the exceptions to the Wisconsin rule can undoubtedly be traced. The conditions in the family and home can be individually weighed to accomplish a fair balancing of all the components present.

Finally, the rule would accord with the spirit of fairness which *Dole* v. *Dow Chem. Co.* (30 N Y 2d 143, *supra*) embraces. "Right to apportionment of liability or to full indemnity, then, as among parties involved together in causing damage by negligence, should rest on relative responsibility and to be determined on the facts" (*id.*, p. 153). A parent adjudged to be negligent because he did not act as a reasonable parent would have under the circumstances should not escape his burden of the apportionment of damages caused by his negligence and the negligence of another concurring to cause injury to his child. Conversely, the entire responsibility of the injury to the child should not be thrust on the stranger, where the parent's negligence to some degree participated in the incident.

In the light of all these factors, consequently, I would hold that the pleading of the defendants is sufficient to raise the issue of the plaintiff father's negligence, for the trial, and that at the trial the issue of the father's negligence should be determined by the rule whether his conduct accorded with what a reasonable parent would have done under similar circumstances.

For the reasons stated, I dissent and vote to affirm.

GULOTTA, P. J. (dissenting). I concur in Justice HOPKINS' view that the order denying the motion by the plaintiff parents to dismiss the counterclaim on the pleadings as insufficient in

law was properly denied, but in some respects my reasons are different.

First, I believe we need not decide at this time whether the rule of *Gelbman* v. *Gelbman* (23 N Y 2d 434) will be extended to situations where there is no compulsory insurance coverage, because this case does not involve a direct suit by a child against his parent, and therefore we need not reach that point.

It may very well be that when the occasion arises *Gelbman* will be interpreted to have gone that far, but we cannot ignore the fact that the opinion in that case relies on the presence of insurance coverage to dispose of the argument that intrafamily suits for simple negligence will be disruptive of family harmony. However, in adopting the reasoning of Judge FULD's dissent in *Badigian* v. *Badigian* (9 N Y 2d 472) the unanimous *Gelbman* court went far beyond that simple argument by pointing out the many situations which were already exempt from the doctrine, e.g., suits involving contracts, wills and inheritances, suits for willful torts, suits for property damage, suits after the minor reaches majority and other situations where there is no insurance, thus indicating that the court was out of sympathy with the old rule for reasons other than that the real defendant in *Gelbman* was the insurance carrier.

It is not amiss to point out that in nonautomobile cases there will often be a homeowner's policy which will trigger the lawsuit and protect the parent whether it be a direct suit or a *Dole* v. *Dow Chem. Co.* (30 N Y 2d 143) type of blame sharing.

Furthermore, even before the advent of *Dole*, in several analogous situations the distinction between direct intrafamily suits and claims-over for indemnity has long been a part of our law. For example, while suits for negligence between spouses were still prohibited, suits by a wife against her husband's employer for her husband's negligence were entertained, although a claim-over for indemnity against the husband could result. At common law a wife could not sue her husband in negligence, but in *Schubert* v. *Schubert Wagon Co.* (249 N. Y. 253 [1928]) she was allowed a recovery against her husband's employer for the husband's negligent operation of an automobile. Chief Judge CARDOZO noted that the master's remedy over against the servant did not alter the result. The purpose of the 1937 amendment to section 57 of the Domestic Relations Law (now General Obligations Law, § 3–313), giving a right of action for tortious acts between spouses (L. 1937, ch. 669, § 1) and the 1941 amendment to subdivision 3 of section 167 of the Insurance Law, excluding insurance coverage in such a case

unless specifically included in an insurance policy (L. 1941, ch. 627, § 1), was to change the common law barring such actions but at the same time protect the insurer against collusive suits (*Jacobs* v. *United States Fid. & Guar. Co.*, 2 Misc 2d 428; *New Amsterdam Cas. Co.* v. *Stecker*, 1 A D 2d 629). Nevertheless, in *Jacobs* (*supra*) a wife recovered on a policy insuring a partnership of which her husband, who was driving the automobile in question, was a member. She had sued only the other partner to avoid the restrictions of the insurance policy.

The same anomaly exists in a suit by a child against a corporate employer of his father for the father's negligence, which was permitted even before *Gelbman* (*supra*). Although the common insurance coverage in such cases makes such a claim-over unlikely, the existence of the right illustrates the point (see *Chase* v. *New Haven Waste Material Corp.*, 111 Conn. 377; *Briggs* v. *City of Philadelphia*, 112 Pa. Super. Ct. 50; *Winnick* v. *Kupperman Constr. Co.*, 29 A D 2d 261; *Sullivan* v. *Christiensen*, 191 N. Y. S. 2d 625). *Kemp* v. *Rockland Leasing* (51 Misc 2d 1073) sustained a suit by an infant passenger against the owner of an automobile operated by his mother with the owner's consent. This was maintained under section 388 of the Vehicle and Traffic Law, which is similar to *respondeat superior* but not identical.

In suits by employees against third-party wrongdoers, claims-over against the employers have been allowed, although the Workmen's Compensation Law bars a direct claim by an employee against his employer where the employer has procured compensation insurance coverage (Workmen's Compensation Law, § 29). See *Westchester Light. Co.* v. *Westchester County Small Estates Corp.* (278 N. Y. 175), where a complaint by a third-party tort-feasor against the employer of one who was killed in the course of his employment was sustained, the court stating in this connection (p. 180): "It may be admitted that if the defendant is held to answer to the plaintiff in this action the result (as the Chief Judge says) is that an employer is made liable indirectly in an amount which could not be recovered directly. This consequence, we think, does not decide the issue against the plaintiff. Recovery over against the employer in an unusual case like this need not be rested upon any theory of subrogation. An independent duty or obligation owed by the employer to the third party is a sufficient basis for the action. (*Schubert* v. *Schubert Wagon Co.*, 249 N. Y. 253.)" To the same effect, see *Wright* v. *Lichtman* (36 Misc 2d 1096, 1097), which also involved a third-party complaint against an employer,

the court stating: " In the case at bar the defendant is charged with negligence ' in failing and omitting to take the necessary precautions to avoid this accident.' It is possible, under the allegations of the complaint, that the defendant will be held liable for some act or omission constituting passive negligence in connection with the repair of his vehicle by the third-party defendant. If he is held liable for such passive negligence, then a claim for indemnification would be proper. Of course, if it is proved upon the trial that he was not negligent at all or that his sole negligence was active, then the claim must fail." (Cf. *Edwards* v. *Sophkirsh Holding Corp.*, 280 App. Div. 168, affd. 304 N. Y. 850.) The scope of such claims will be greatly amplified by the application of *Dole* (*supra*), eliminating as it does the need to differentiate between active and passive negligence to sustain such a claim.

So I think it important to recognize at the outset that the circuitous suit is not identical with a direct claim and that the one can and has existed, without the right to maintain the other.

We recognized the distinction in *State Farm Mut. Auto. Ins. Co.* v. *Westlake* (43 A D 2d 314) where a husband's insurance company was required to defend a *Dole* counterclaim by the defendant against the husband in a suit by the wife who had been a passenger in the husband's automobile, although subdivision 3 of section 167 of the Insurance Law clearly bars such coverage in a suit directly between the spouses. Thus we necessarily recognized that the cases are not the same. This followed our decision in *Moreno* v. *Galdorisi* (39 A D 2d 450) where we permitted a *Dole*-type claim-over to be made against a husband who was driving the automobile in which his wife was a passenger and which had been involved in a collision with the defendant.

Passing to the next point, since we are dealing only with the sufficiency of a pleading, it is important to keep in mind that in general CPLR 3013, reading as follows: " Statements in a pleading shall be sufficiently particular to give the court and parties notice of the transactions, occurrences, or series of transactions or occurrences, intended to be proved and the material elements of each cause of action or defense ", has done away with any need to supply the details which constitute a defendant's alleged negligence in order to survive a motion to dismiss. (See Practice Commentaries to that section by Professor David D. Siegel [McKinney's Cons. Laws of N. Y., Book 7B, p. 609 *et seq.*].)

Dean Joseph M. McLaughlin of Fordham Law School, in analyzing *Hairston* v. *Broadwater* (73 Misc 2d 523), which held a counterclaim by a tort-feasor against a parent insufficient, observed (in the New York Law Journal, May 11, 1973, pp. 1–2): "The last conclusion is troublesome. Even if, as the court held, ' requisite factors of hazard and neglect must offer themselves before a parent can be deemed to have so offended standards of care and responsibility to have breached a legal duty to a child * * * ,' the court seems to arrive at this conclusion prematurely. To survive a dismissal motion, a complaint (or a counterclaim) need only *state* a cause of action. It need not *prove* one.

"Official Form 12 of the Judicial Conference's Appendix of Judicial Forms is a complaint for negligence in automobile accident cases. Paragraph 3 is the heart of the complaint; and it alleges simply that ' solely as a result of defendant C.D.'s negligence, plaintiff was personally injured . . .' If this Olympian generality is sufficient to state a cause of action for negligence in a complaint, why is a higher standard expected of a counterclaim?

"In short, it is suggested that defendants should be permitted to counterclaim against the parent of an infant plaintiff and that, *at least in the pleading stage, it should be sufficient for the defendant to charge the parent with blanket negligence. If, after pre-trial disclosure, it appears that the facts do not support a cause of action against the parent, a motion may be made to dismiss the counterclaim for failure to state a cause of action or the parent may move for summary judgment. To reiterate: it seems unfair to dismiss these counterclaims at the threshold before the defendant has had an opportunity to develop the facts* " (emphasis supplied).

It seems to me that even if we are to adopt some special tests in determining when a parent has been negligent vis-à-vis his child, the pertinent application should be made to the proof adduced at a trial or even on a motion for summary judgment, but not at the pleading stage.

This brings me to what I regard as the central issue in this case and that is whether there already exists or whether we should adopt a blanket rule declaring that no cause of action will lie against a parent in negligence for acts of omission toward his children, that is, for lack of supervision.

I have found no authority and the majority opinion cites none to support the view that the early common law drew a distinction between negligent acts of commission and negligent acts of omission in this respect.

It may be true, as Chief Judge Desmond remarked in the majority opinion in *Badigian* v. *Badigian* (9 N Y 2d 472, *supra*), that there is no decision in an American or English appellate court sustaining a cause of action for lack of supervision by a parent, but it seems to be equally true that there is no decision denying such right. In view of the immunity doctrine which became firmly entrenched in New York law when the question first came up in a case involving active negligence (*Sorrentino* v. *Sorrentino,* 248 N. Y. 626), one would hardly expect the question to come up with respect to the lesser wrong of passive negligence. Therefore, we would not be justified in concluding, from this absence of case law, that the right did not exist. It is noted in Ann. 19 ALR 2d 423, 430–431: '' No better light on the whole problem will be found than that of the full discussion by Chief Justice Peaslee in Dunlap. v. Dunlap [fn. (1930) 84 N H 352, 150 A 905.]. That learned judge declared without qualification that ' there never has been a common law rule that a child could not sue its parent.' Concurrence in that conclusion is found elsewhere, including the works of English writers. Yet the American cases often contain the statement that ' at common law ' the action was denied.''

In another context the Court of Appeals has indeed recognized that lack of supervision by a parent can amount to negligence. That was at a time when the negligence of a parent was imputed to a child and it then could be utilized by a defendant to defeat a recovery by the infant on the ground of contributory negligence (see *Weil* v. *Dry Dock, East Broadway & Battery R. R. Co.,* 119 N. Y. 147; *Mangam* v. *Brooklyn R. R. Co.* (38 N. Y. 455). In *Weil,* where the court had nonsuited the infant plaintiff because of the alleged negligence of the parent in supervising the infant, the court said (p. 153): '' The plaintiff's parents were bound to protect her from danger so far as that could be done by the exercise of reasonable prudence and care. The law did not require the father to suspend his business and keep the child every moment under his eye. He was required only to exercise such a degree of care as was reasonable in his situation and under all the circumstances of the case. Whether in this case the father did, in fact, all that a reasonably careful and prudent man ought to have done under the circumstances, was a question for the jury and not for the court. (*Birkett* v. *K. I. Co.,* 110 N. Y. 506; *Kunz* v. *City of Troy,* 104 N. Y. 344; *Stackus* v. *N. Y. C. & H. R. R. R. Co.,* 79 N. Y. 464.) ''

The fact that the contributory negligence of a parent is no longer imputed to an infant does not detract from the relevancy of these cases to the present discussion.

Judge FULD in *Badigian* (*supra*) pointed out (citing Prosser, Law of Torts [2d ed., 1955], p. 675) that the family immunity doctrine was without precedent in English common law. It was first announced in this country in 1891 in a Mississippi case (*Hewlett* v. *George*, 68 Miss. 703). That case involved a willful tort since it was a suit by a minor daughter against her mother for maliciously confining her in an insane asylum. The doctrine spread to negligent torts in other States, but it was not until 1928 that it was applied in New York to a negligence case involving the operation of an automobile in a 4 to 3 decision, without opinion, which affirmed a Second Department decision, which was also without opinion (*Sorrentino* v. *Sorrentino*, 248 N. Y. 626, affg. 222 App. Div. 835, *supra*). It has never been applied in New York to willful torts.

The opinion in *Cannon* v. *Cannon* (287 N. Y. 425 [1942]) reaffirmed the doctrine as limited to a negligent tort, using language which could be interpreted to mean that the cause of action did not exist, rather than that it did but was barred for public policy reasons. However, in *Gelbman* (*supra*) Judge BURKE noted very explicitly that this was not the case, stating that immunity was a court-made rule which could be abandoned by the court and that abolishing the defense of intrafamily tort immunity for nonwillful torts did not create a new liability where none had existed, but rather recognized that it had existed all along, although recovery had been barred.

With the policy reasons for not applying the standardized duty of the reasonable prudent man to household situations involving a parent-child relationship alluded to by Judge FULD in *Badigian* (*supra*) and Justice SHAPIRO in this case, I find myself in agreement. It is aptly summed up in *Badigian* in the following excerpt (p. 480): " Heed, it may well be, must be given to excuses to which the law declines to listen when the victim is a business visitor. The house or the apartment may be out of order or in need of repair, but, there is force to the query, what is the father to do if there is no money to repair it? It may be unsanitary and in poor condition, but it is futile to seek a better one when it is beyond the father's financial ability to pay the higher rent. Those who share the family life must of necessity share its fortunes, its privations and hardships, as well as its gains. In ancient times, ' the Family, in fact, was a Corporation; and [the *pater familias*] was its representative or, we might almost say, its Public officer.' (Maine, Ancient Law [1st Amer. ed., 1864], p. 178.) Something of the same concept is present today. In the ordering of the home,

the father is still the judge, or, better perhaps, the king, not liable for error while he acts in good faith, without malice or indifference.''

However, it seems to me that *Holodook* v. *Spencer* (43 A D 2d 129) and *Graney* v. *Graney* (43 A D 2d 207) go too far in constructing a new rule of parental immunity covering all negligence supervision cases. They are both Third Department cases; they both involved four-year-old children who were *non sui juris,* but in the former a counterclaim was asserted against the parent by the defendant and in the latter a direct claim against the parent was made by the child.

Those cases suggest that the proper rule to be applied is that a parent would only be liable when he would be liable under like circumstances to a stranger. Frankly, I do not understand how such a rule could be applied to a lack of supervision case, unless it is just another way of saying we would not allow the lawsuit at all. A parent has no duty to supervise strange children per se, but if he or she undertakes to do so, they should indeed be liable for negligent supervision, in my opinion. On the other hand, supervision is a duty imposed on a parent without any special undertaking.

I agree that a large measure of discretion must be accorded to a parent in dealing with the care and custody of his or her children, but I do not think that a blanket exemption should be made for all nonsupervision cases, regardless of the circumstances, as the Third and Fourth Departments have done. For instance, if a parent were to allow a four-year-old nonswimming child to play unsupervised on an unfenced dock bordered by water 20-feet deep, I would want to hear the proof before dismissing the case, albeit the gravamen of the charge is lack of supervision. The same could be said if a child of tender years were left to play near a high voltage substation with the gate open or a hole in the fence. Many other illustrations could be given.

The rule of *Goller* v. *White* (20 Wisc. 2d 402) may present a workable compromise between the need to preserve some freedom of action on the part of a parent and the need to protect the child. It abrogates parental immunity, but excepts acts involving the exercise of parental authority and the exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services and other care. Admittedly the application of such a rule presents difficulties of its own. For instance, is lack of supervision encompassed in the phrase '' other care ''? Refinements would no

doubt develop with the application of the rule to varying fact situations over the years, but I think the aim should be to protect a parent from mere errors of judgment which hindsight discloses to have been wrong or unwise, while not losing sight of the need to protect a child from a grossly careless parent.

I am of the opinion that we should hear the proof in this case where the charge is nonsupervision of a four-year-old child allowed to go out on the public highway where he was struck by the defendant's truck.

Therefore, I would affirm the order under review.

MARTUSCELLO and LATHAM, JJ., concur with SHAPIRO, J.; GULOTTA, P. J., and HOPKINS, J., dissent and vote to affirm with separate opinions.

Order reversed, on the law, with $20 costs and disbursements, and motion granted.